Filed 5/11/23  P. v. Venancio CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B320236 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA101022) |
| v. | |
| FERNANDO VENANCIO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Blake Armstrong, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Fernando Venancio, Jr., appeals from a judgment of conviction after the jury found him guilty of the forcible rapes of Evelyn S., Tracy D., and Lisa M.; the assault of Gabriela S. with intent to commit rape; sexual penetration by use of force as to Evelyn; and petty theft as to Lisa and Gabriela. The jury also found true Venancio used a handgun in the commission of the rapes of Tracy and Lisa and the assault of Gabriela.

On appeal, Venancio contends the trial court violated his constitutional and statutory rights by conducting most of the trial in his absence after the court found he waived his right to attend trial by spreading feces on his body and the courthouse holding cell on three occasions (including after the court's admonishment) and by resisting efforts to prepare him to appear in the courtroom. Venancio also contends his trial attorney provided ineffective assistance of counsel by failing to object to hearsay statements the victims made to sexual assault response team nurses. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Evidence at Trial*
1.   *Evelyn—June 15-16, 2019*
Evelyn testified that on the evening of June 15, 2019 Venancio responded to her online advertisement for escort services.[1] She agreed to meet him for $600 for one hour, and she drove to a location on 18th Street in Santa Monica. When she

---

[1]   Evelyn identified the man she met in response to the advertisement as Venancio after being shown a six-pack photographic lineup. Tracy, Lisa, and Gabriela also identified Venancio from six-pack photographic lineups.

arrived, Evelyn followed Venancio through a gate to an abandoned apartment with a mattress on the floor. When Evelyn told Venancio he needed to pay in advance for sexual services, Venancio said he did not have the money but would give her bottles of wine in lieu of payment. Evelyn refused and tried to leave, but Venancio blocked her path. When she tried to push him out of the way, he grabbed her throat and pulled her down to the floor. Keeping one hand on her throat and squeezing when she resisted, Venancio removed her clothing. Venancio got on top of her and partially penetrated her vagina with his penis while covering her mouth and nose. He tried to give her drugs, but she refused. Venancio then digitally penetrated her vagina with two of his fingers. Venancio continued to grab Evelyn by the throat and at times choke her, making it difficult to breathe, and he partially, then fully penetrated her vagina and engaged in intercourse. When Venancio got up, Evelyn pushed him hard and ran out of the apartment naked, screaming for help as she ran into the street.

Catherine Hedden testified she was awoken by Evelyn's screams for help and went onto the balcony of the rental property where she was staying. Evelyn was screaming, "'Help me. Help me. Somebody help me. He's trying to kill me.'" Evelyn was visibly scared and shaking. Hedden dropped a t-shirt down to Evelyn and went downstairs. A bystander, Carol Martinez, called 911. She told the dispatcher Evelyn said a man was raping her and had choked her. Evelyn then came on the line and told the dispatcher she had been working at a strip club and met a

man who was going to help her out with money, but he took her to an abandoned house and raped her.[2]

At 4:17 a.m. on June 16 Santa Monica Police Officer Evan Raleigh received a call from dispatch to respond to the scene. When he arrived, Evelyn was in the street in an oversized t-shirt and socks, and she was "shaken up" and crying. Evelyn provided a physical description of her assailant and told Officer Raleigh she had agreed to model for Venancio and possibly engage in sexual relations for a fee, but he attacked and raped her. Raleigh and other police officers searched for Venancio but did not find him.

Officer Raleigh brought Evelyn to the UCLA Santa Monica Rape Treatment Center (rape treatment center), where she was examined by Page Courtemanche, a sexual assault response team (SART) nurse. According to Courtemanche's report,[3] Evelyn told Courtemanche she met Venancio at a strip club and agreed to dance for him for $600, but after bringing her back to his residence, he held her down, choked her, and raped her. He also forced her to ingest methamphetamine. Evelyn reported Venancio threatened her, saying, "'[I]f you're good, it's not gonna be as bad,'" "'I don't wanna slap you. You need to settle down,'" "'I'm a professional,'" and "'Give me head.'"

During her physical examination of Evelyn, Courtemanche found abrasions on Evelyn's neck and elbow. Courtemanche took

---

[2]     A recording of the 911 call was played for the jury.

[3]     Elizabeth Tighe, a nurse practitioner and supervisor at the rape treatment center, testified regarding Courtemanche's examination of Evelyn and report. Tighe also testified about other SART nurses' examinations of Tracy and Gabriela, as well as Venancio (after he was apprehended).

4

swabs from various places on Evelyn's body.  Jessica Luna, a senior criminalist at the Los Angeles County Sheriff's Department crime lab, testified that analysis of the swabs showed the presence of sperm cells and Venancio's DNA on Evelyn's breast, hand, chin, and genitals.

### 2.    *Tracy—July 10, 2019*

In July 2019 Tracy was unhoused and living in a van parked in Santa Monica.  She testified that around 11:00 p.m. on July 10 she rode her bike to a gas station to buy cigarettes.  After she bought the cigarettes, Venancio came up to her and offered to give her money for sexual acts, but she declined.  However, she agreed to trade her cigarettes for a small amount of crystal methamphetamine.  Tracy followed Venancio to a parking lot to complete the transaction.

When they arrived at the parking lot, Venancio reached into his backpack and pulled out a handgun.  He pointed the gun at Tracy's head while wrapping his other arm around her throat, and she was "scared to death."  With his arm still around her neck, Venancio took Tracy toward the dumpsters in the back of the parking lot.  He said he would not hurt her but was going to "'fuck the shit'" out of her, and he was "'doing God's work'" by "'teaching you girls not to trust men out here because next time you might not be so lucky.'"

Venancio, while still holding the gun, ordered Tracy to undress and lie down on the ground.  He climbed on top of her and penetrated her vagina with his penis, and they had intercourse for 10 to 15 minutes.  He did not wear a condom, but he removed his penis before ejaculating.  After he finished, he allowed Tracy to dress and leave.

Tracy told her boyfriend about the rape but initially did not report it because she felt humiliated. She reported it on July 13 after seeing an article in the newspaper. The police took her to the rape treatment center, where she was examined by SART nurse Kari Herrington. Because Tracy had wiped her vaginal and anal area after the intercourse and had been menstruating, the potential for recovery of forensic evidence was limited. DNA testing of swabs from Tracy's body did not match Venancio's DNA.

3. *Lisa—July 12, 2019*

Lisa testified that at around 9:30 p.m. on July 12, 2019 she was outside a supermarket on Broadway in Santa Monica on the phone with her friend Bernard, who was threatening to throw out the belongings she kept at his residence. She was carrying a bag with some clothes, a tablet computer, a cell phone charging cord, and food. Venancio approached her and asked if she was okay. They talked, and Venancio seemed "really nice" and offered to drive her to Bernard's apartment to retrieve her belongings. Venancio said they needed to walk to a nearby location to get his car keys. He was persistent, and Lisa reluctantly went with him. When they arrived at the location, Lisa followed Venancio up a staircase into a small room with a couch and boxes. He briefly went into another room, and when he returned, he appeared "agitated" and "hyper"; she believed he was high on drugs because he was sniffing something with a straw.

Venancio pulled a handgun out of his bag and said, "'I'm not gonna kill you. But I'm gonna make your night . . . a living hell.'" He spat on Lisa's face and punched her in the eye. He ripped off her clothing while she tried to fight him off, and he

pinned her to the couch as he penetrated her vagina with his penis for approximately 10 minutes without a condom. As they had intercourse, Lisa could see his gun that was sitting next to the couch, and she was so scared she defecated. Venancio abruptly stopped. He then gathered his belongings, took Lisa's tablet and the food from her bag, and left.

Lisa did not initially report the rape to the police because she was embarrassed, but a few days later a community center case manager referred her to the Venice Family Clinic to treat her injuries. On July 18 nurse Nancy Pierre-Paul examined Lisa. Pierre-Paul testified that Lisa had a swollen black eye and bruising on her chest. Pierre-Paul filed a "suspicious injury report," and Lisa was brought to the rape treatment center. Lisa's belongings from July 12 were tested, and Venancio's DNA was found on Lisa's hoodie, tank top, bag, and water bottle, and on the couch in the room where the incident occurred.

### 4.  *Gabriela—July 22, 2019*

Gabriela testified that on the afternoon of July 22, 2019 a man responded to her online advertisement for escort services. They agreed to $400 for one hour of sexual intercourse. He told her to meet him at the 18th Street location in Santa Monica. When she arrived, Venancio gave her a small hug and led her into "an old garage shack kind of thing." Gabriela sat down on a mat with pillows and asked for the money. Venancio said "'yeah'" and went behind a partition.

Venancio returned, holding a handgun and a knife. Gabriela told him she was leaving, but Venancio said, "'No. I'm gonna fuck you. I'm not done with you yet.'" He placed the knife against her neck and the gun to her chest. Gabriela managed to

7

push the emergency button on her phone while it was in her pocket. Venancio then covered her mouth with his arm, making it hard for her to breathe, and he punched the side of her face with the gun and slapped her. He climbed on top of her, and she tried to fight him off with her nails and a wine opener.

Venancio then realized she had called the police on her phone, and he ran off with her phone and his gun and knife. Gabriela ran after him to try to get her phone back, but she could not catch him. She called 911 from a bystander's phone, and the police arrived shortly thereafter to take her statement. Later that day Santa Monica Police Detective Brian Spencer detained Venancio a few blocks away based on Gabriela's description. No weapons were found on Venancio.[4]

Gabriela was examined by nurse Cindy Swintelski at the rape treatment center approximately four hours after the incident. Swintelski prepared a SART report based on her examination. Tighe testified based on the SART report that Gabriela told Swintelski that Venancio first offered her wine and water and massaged her body with oil but then forced his fingers inside her vagina, "'tapped'" his penis against her buttocks, and placed his mouth on her vagina, at which point Gabriela asked for her money. Venancio brought out a gun and a hammer. Gabriela told Swintelski that Venancio saw her press the emergency button on her phone and then grabbed the phone; he struck her face and choked her; and they struggled as she tried to

_____

[4]     Detective Spencer brought Venancio to the rape treatment center where he was examined by nurse Lizette Castro early on the morning of July 23. Venancio consented to an examination, and samples were taken from his body. Castro noted an abrasion on his torso and lacerations on the side of his chest.

get away.  Gabriela reported that Venancio threatened her, saying: "'You aren't leaving until I come'"; "'I'm trying to teach you a lesson'"; "'This isn't my first rodeo'"; and "'I teach girls lessons when they are on these sites.'"  Swintelski observed bruises on Gabriela's leg, wrist, and forearm, and an injury to her fingernail.  Samples collected from Gabriela's body showed Venancio's DNA on her breasts, exterior genitals, and perianal region.

Venancio did not call any witnesses or present evidence.

B.    *The Verdicts and Sentencing*

On February 23, 2022 the jury found Venancio guilty of the forcible rape of Evelyn, Lisa, and Tracy (counts 1, 3, 7; Pen. Code, § 261, subd. (a)(2));[5] sexual penetration by use of force as to Evelyn (count 2; § 289, subd. (a)(1)(A)); and assault with the intent to commit rape as to Gabriela (count 5; § 220, subd. (a)(1)). The jury found Venancio not guilty of the second degree robberies of Lisa and Gabriela but guilty of the lesser included offense of petty theft (counts 4, 6; § 484, subd. (a)).  The jury also found true as to counts 3, 5, and 7 that Venancio personally used a firearm (a handgun) in the commission of the rapes of Lisa and Tracy and the assault of Gabriela (§ 12022.5, subd. (a)).

In a bifurcated proceeding, on February 23, 2022 the jury found true as to counts 3 and 7 for forcible rape the special allegations under section 667.61, subdivisions (a), (c), (e)(3), and (e)(4), that Venancio used a firearm in the commission of the rapes and Venancio committed the rapes against more than one victim.  The jury also found true the sentencing factors that

---

[5]      Further statutory references are to the Penal Code.

Venancio's crime involved the threat of great bodily harm; the manner in which the crimes were carried out indicated planning or sophistication; and Venancio engaged in violent conduct that indicated a serious danger to society.

On May 9, 2022 the trial court sentenced Venancio to an aggregate term of 96 years to life in state prison. The court imposed consecutive indeterminate terms of 15 years to life on counts 1 and 2 and 25 years to life on counts 3 and 7.[6] The court imposed a 16-year term on count 5 for assault with intent to commit rape comprised of the upper term of six years for offense, plus the upper term of 10 years for the firearm-use enhancement. On counts 4 and 6 for petty theft, the court sentenced Venancio to concurrent six-month terms in county jail.

Venancio timely appealed.

---

[6] The 25-years-to-life sentences on counts 3 and 7 were imposed pursuant to the jury's fundings under section 667.61, subdivisions (a), (e)(3) and (e)(4). The jury did not make specific findings as to counts 1 and 2 (forcible rape and sexual penetration of Evelyn) under section 667.61, subdivisions (b) and (e)(4), to support the 15-years-to-life sentences, but the same jury finding that Venancio was convicted of rape and/or forcible sexual penetration against more than one victim would apply equally to counts 1 and 2. Venancio does not argue the lack of specific findings on these counts was error.

## DISCUSSION

A.  *The Trial Court Did Not Violate Venancio's Statutory and Constitutional Rights To Be Present at Trial*

1.  *Trial court proceedings*

*January 5, 2022*:  On the date set for trial, Venancio refused to leave his cell in county jail.  The trial court issued an extraction order for January 11.

*January 11*:  Venancio did not leave the jail because he reported feeling ill.  The trial court ordered a medical examination and an extraction on January 27.

*January 27*:  Venancio came to the court in a "suicide vest."  Defense counsel stated Venancio was noncommunicative and it had been several months since Venancio's last psychiatric evaluation.

*January 28*:  Venancio missed the first bus from jail, and Deputy Campos, the courtroom deputy, relayed information from the jail that Venancio claimed to be hearing voices telling him not to come to court.  Venancio later appeared in a suicide vest, and when the trial court asked if he would like different clothing, Venancio stated, "I don't understand what's going on.  And this guy right here [referring to defense counsel], he's not helping me.  I don't think he's fair.  I don't know who he is."  Venancio refused to respond to questions from the court or Deputy Campos.  The court appointed psychiatrist Dr. Kory Knapke, who had previously examined Venancio, to examine him.

*January 31*:  Dr. Knapke met with Venancio in an interview room next to the holding cell in the courthouse (adjacent to the courtroom).  Dr. Knapke reported to the trial court:  "Mr. Venancio entered the interview room and he had no

11

eye contact with me whatsoever, which is a big red flag . . . in terms of the potential of malingering.  And he then turned around, and it looked like he was grabbing for something and he was.  He was putting feces all over his face, started eating his feces, and then he started smearing feces all over the interview room."  Venancio told Dr. Knapke, "'The demons are bothering me.  Everyone's against me.'"  Otherwise, Venancio was "selectively mute," refusing to answer Dr. Knapke's questions about courtroom proceedings and "only wanting to make a comment about his alleged psychotic symptoms, which are all very new symptoms based upon the jail mental health records that I reviewed."  Dr. Knapke opined, "[C]learly the defendant is malingering.  His symptoms are very contrived and exaggerated, and I strongly believe that he's competent to stand trial."  The court ordered Venancio to be transported to court the following day in a safety chair "where he's strapped down and he cannot have the use of his hands to do what he did [before] tomorrow in the courtroom."

*February 1*:  The trial court ruled Venancio was competent to stand trial based on Dr. Knapke's oral and written report.  Venancio appeared in the courtroom strapped into a safety chair, unable to move his arms.  The court admonished Venancio that his conduct the previous day in spreading feces all over himself "will not be tolerated during the trial."  The court explained to Venancio his options:  He could assure the court he would not spread feces again and wanted to remain in the courtroom, or he could voluntarily absent himself and listen to the trial from a nearby conference room with access to his attorney.  Alternatively, he could be restrained to prevent the same behavior (for example, in the safety chair), but appearing in

restraints could prejudice his case. The court advised Venancio that if he did not say what he wanted to do, the court was "going to assume that [he was] going to be disruptive."

The trial court told Venancio they were about to start jury selection and the jurors were in the hallway. The court asked Venancio to respond "yes" or "no" as to whether he wanted to be present in the courtroom during trial. Venancio did not respond. The court gave Venancio an opportunity to talk to his attorney about his options. Defense counsel talked to Venancio but then informed the court he "got no response" to the court's questions. The court addressed Venancio in making its findings: "You are competent and that you are malingering and that you did what you did yesterday because you knew this trial was starting . . . . And so you are trying to disrupt these proceedings." The court found further Venancio intentionally did not respond to the court's questions, affirming he did not wish to be present.

The trial court decided, however, that Venancio should be present for the swearing in of the jury so he would appreciate that the trial was commencing. The court, counsel, Deputy Campos, and Los Angeles County Sheriff's Sergeant Davis-Linton (assigned to the courthouse) discussed options for restraining Venancio. Defense counsel did not want Venancio to appear in handcuffs and suggested a waist chain that would not be visible to jurors. But Deputy Campos noted a waist chain allowed Venancio access to his buttocks, and he had been wearing a chain when he spread his feces the previous day. Defense counsel requested the sheriff's deputies dress Venancio in civilian clothing, but Venancio was uncooperative and "went limp" when deputies tried to lift his arm to change his shirt. Deputy Campos and defense counsel agreed it would be acceptable if Venancio

13

remained in jail clothes and wore the waist chain. However, after a recess, Deputy Campos reported Venancio went limp when deputies attempted to remove him from the safety chair to place him in a waist chain.

Defense counsel conceded the attempts to prepare Venancio for the courtroom were "fruitless" and stated, "It doesn't make sense to me if he's just not cooperating at all why we should make any additional efforts." Ultimately, Venancio was brought into the courtroom in the safety chair while the trial court questioned jurors about potential hardships. After dismissing the hardship jurors, the court stated for the record, "Mr. Venancio is still in the chair, was facing all of the jurors, was present during this hearing. The court makes a finding that he understands that this trial is commenced and that we are engaged in the voir dire process." The court asked Venancio whether he wanted to be present in court for the afternoon session; Venancio did not respond. The court again advised Venancio of his right to be present and asked him what he wanted to do. Venancio still did not respond. At the end of the day the court advised the attorneys that it did not believe Venancio's refusal to respond to questions constituted a waiver of his right to appear, and it ordered that Venancio be extracted from his cell the following day and restrained with a waist chain, which defense counsel could conceal with a coat.

*February 2*: Venancio was mistakenly transported to court in the safety chair rather than a waist chain. Deputies attempted to remove him from the safety chair and dress him in civilian clothes, but he gripped the arms of the chair and would not allow the deputies to lift him up. The trial court advised Venancio that they were trying to remove him from the chair so

14

the jury would not see him restrained because that would be "very, very prejudicial" to him. The court asked defense counsel whether Venancio could remain in the safety chair as a "last resort." Defense counsel responded, "I think he's better off not being here at all, just for the record. This is a sort of chair—it's like death chamber. It's got a ton of straps. It's very prejudicial. It's going to give the impression that [Venancio] is dangerous. He's never done anything violent. He's never acted out in court." Deputy Campos released Venancio's arm from the chair so another attempt could be made to move him, but Venancio would not lift up his arm and tensed up when Campos tried again to lift it.

The trial court found by clear and convincing evidence that Venancio's refusal to get out of the chair demonstrated a refusal to appear in court, explaining, "[B]y virtue of your body language and your holding on that chair, I am making the finding that you are uncooperative. You are refusing to be in the courtroom appropriately and engage in appropriate, conforming behavior in the court." The court informed Venancio the trial would proceed without him but that he would be ordered back the following day, and he could change his mind and attend the trial if he would conform his behavior. The court advised counsel: "I want this [to be] very clear on the record—that [Venancio] is listening to everything. He understands everything. He's competent to start this trial. He's malingering. And he is purposefully not answering the court's questions. And that is my finding by clear and convincing evidence considering Dr. Knapke's report and everything else . . . . He's being resistive because we can't get him out of the stretcher chair or the safety chair to put him into the chair for trial. He needs to be in that chair for trial because

15

I'm not going to have him—and counsel doesn't want him—I'm not going to have him in horrible restraints like this in front of the jury."

The trial court ordered that Venancio be placed in a room that afternoon to listen to jury selection on a speaker. The court advised the jury, "Mr. Venancio is not present with us today. Do not consider that for any reason." However, at some point during the afternoon session, Venancio was taken back to jail because he urinated on himself while in the safety chair.[7] The court and attorneys conferred about how to proceed, and the prosecutor expressed concern there was "not sufficient clarity" to establish Venancio was voluntarily absenting himself from trial. The court found Venancio should not have been delivered in a safety chair, and it ordered that Venancio not be placed in a safety chair the following day.

*February 3*: Venancio came to the courthouse in a waist chain. However, Sergeant Davis-Linton advised the court that while Venancio was waiting in a holding cell in the courthouse, he slipped off his waist chain, defecated, and smeared the feces all over the cell and himself. Venancio also claimed demons were talking to him. Sergeant Davis-Linton spoke to the sergeant at the county jail, who reported that Venancio had been cooperative and communicative while at the jail, including that morning. The trial court agreed with Sergeant Davis-Linton that Venancio's actions appeared to be calculated. The court

---

[7] During the morning hearing, while Venancio was present, Sergeant Davis-Linton had expressed his concern that Venancio would not ask deputies for bathroom breaks while in the lockup room, and as a result, "he's almost guaranteed to urinate in his chair."

requested that Venancio be cleaned up in the courthouse holding cell and read an advisement about his right to be present,[8] but the bailiff responsible for Venancio reported there was no way to sufficiently clean Venancio because there was no shower in the courthouse and paper towels were inadequate to remove the feces he had smeared all over his body. The court ruled, "I am deeming that he is refusing to come to court today. I find by clear and convincing evidence that his conduct is a refusal of coming to court. It's clear that by slipping the waist chains, by defecating again, by smearing it all over, that he is refusing to attend his trial." The court added that it would order Venancio extracted every day of the trial "just in case he changes his mind."

During the afternoon session, the trial court found, "It is clear to me, again, that Dr. [Knapke's] opinion as to the defendant's competency has been reinforced by virtue of the information that we now have; that when he is at the jail near his cell at county and he's talked to, he completely responds. He has no problem at the jail. But as soon as he is transported to his trial location, that's when he . . . presents as somebody who is hearing demons, and it is clear that he is malingering to this court." The court continued, "He is disruptive. He is causing problems. He is trying to muck up our proceedings. And the court finds by clear and convincing evidence that he is voluntarily, by his behavior, absenting himself from this trial and that he is disruptive and nonconforming, and that this is the reason we're going ahead without him." The court resumed jury selection in Venancio's absence.

---

[8] The court ordered Sergeant Davis-Linton to advise Venancio daily of his right to appear and provide a recording to the court.

*February 7*:  Sergeant Davis-Linton informed the trial court that at the jail that morning, Venancio was "coherent and compliant and came to court.  But immediately when he was put into a cell . . . . [h]ere at LAX court, he smeared feces everywhere—all over a huge cell."  The court found it was the third time that Venancio had smeared feces all over the holding cell and it was clear he was voluntarily absenting himself.  The court asked if Venancio could be brought into the courtroom, but Sergeant Davis-Linton said it was not possible because Venancio had smeared feces "all over his face and hair" and possibly elsewhere on his body, and deputies would be unable to properly handle him.  Sergeant Davis-Linton had opened the holding cell and asked Venancio if he wanted to appear, but Venancio was nonresponsive.  The court found it was not necessary to bring Venancio into the courtroom:  "He's been advised over and over again about his right to attend . . . his trial.  So that's without question.  He knows what's going on . . . .  And it is clear to me that his behavior is completely different when he's at county jail versus when he gets here, and that's when he starts acting up.  So I am going to send him back to the jail.  I'm going to make this finding throughout the trial that he does not want to be here.  Every so often I will order him to the court.  I don't think I have to do it every day.  But I will order him to be present every few days, and we'll see if his behavior has changed."  The court instructed defense counsel to speak to Venancio at the jail.  The court resumed jury selection in Venancio's absence, instructing the jurors not to consider his absence for any purpose.

*February 8*:  After the conclusion of jury selection, Venancio was brought into the courtroom strapped to the safety chair outside the presence of the jury.  Defense counsel informed the

18

trial court that he went to the jail the previous day and waited to meet with Venancio, but Venancio was not brought out. Defense counsel did not know why. The court advised Venancio it had found he voluntarily absented himself and waived his right to be present by his behavior, but Venancio could be present if he changed his mind. The court continued, "But we will no longer be ordering you out every day because now you've done this on . . . three or four occasions. Today, you're in the safety chair so you can't do it again. . . . Do you want to conform your behavior and do you want to present at your trial? Do you want to be in the courtroom? Do you want to be in the lockup listening to your trial on the speaker?" Venancio did not respond.

*February 8 through February 22*: Venancio was not present for any of the trial proceedings that began on the afternoon of February 8, continued on February 9, 10, 14, 15, 16, 17, and 22, and concluded with delivery of the verdict on February 23. As part of its preliminary jury instructions on February 8, the trial court advised the jury: "You are not to speculate as to why the defendant, Fernando Venancio, Jr., is not present during the trial. His absence is not evidence. You must not consider his absence in any way. You must not discuss his absence during your deliberations, and it must not affect your evaluation of this case or your decision in any way." On February 16 the court ordered that Venancio be transferred to the courtroom in a safety chair. Outside the presence of the jury, the court asked Venancio if he wanted to attend the trial, and if he wished to testify. Venancio did not respond.

*May 9, 2022*: Venancio was present and testified at his sentencing hearing.

19

2.     *Governing law and standard of review*

"""Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043.""" (*People v. Sandoval* (2015) 62 Cal.4th 394, 431; accord, *Illinois v. Allen* (1970) 397 U.S. 337, 338 ["One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial . . . ."]; *People v. Ramirez* (2022) 14 Cal.5th 176, 188 (*Ramirez*) ["A criminal defendant's right to be present at trial is protected under both the federal and state Constitutions."].)

However, a defendant's constitutional right to be present "'may be lost by consent or at times even by misconduct.'" (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*); see *People v. Espinoza* (2016) 1 Cal.5th 61, 72 [a defendant's voluntary absence from trial "'operates as a waiver of his right to be present,'" italics omitted]; *People v. Concepcion* (2008) 45 Cal.4th 77, 82, fn. 7 ["the doctrine that a defendant impliedly waives the right of presence by voluntarily absenting himself from trial has been well established . . . for almost a century"].)  """In determining whether a defendant is absent voluntarily, a court must look at the 'totality of the facts.'""" (*Ramirez, supra*, 14 Cal.5th at p. 192; accord, *Gutierrez*, at p. 1205.)  Relevant facts include whether the defendant was """aware of the processes taking place,""" he knew of """his right and of his obligation to be

20

present,"'" and he had ""'no sound reason for remaining away."'"'" (*Ramirez*, at p. 190; accord, *Espinoza*, at p. 74.)

"Sections 977 and 1043 implement the state constitutional protection." (*Gutierrez, supra*, 29 Cal.4th at p. 1202.) Section 977, former subdivision (b)(1), in effect at the time of Venancio's trial, provided, as relevant here, "[I]n all cases in which a felony is charged, the accused shall be personally present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless they shall, with leave of court, execute in open court, a written waiver of their right to be personally present, as provided by paragraph (2)."[9] (Stats. 2021, ch. 196, §1.) Section 1043, subdivision (a), similarly provides, "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial." Subdivision (b) provides, however, "The absence of the defendant in a felony case after the trial has commenced in their physical presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the defendant, after being warned by the judge that they will be removed if they continue their disruptive behavior, nevertheless insists on acting in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with the defendant present in the courtroom. [¶] (2) Any prosecution for an offense which is not punishable by death in which the

_____

[9] Effective June 30, 2022 (sunsetting on January 1, 2024), section 977, subdivision (b), was amended to provide for physical or remote presence for certain proceedings.

defendant is voluntarily absent." Subdivision (c) provides further, "Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim the right to be present at the trial as soon as they are willing to act consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."

The Supreme Court in *Gutierrez* clarified that sections 977 and 1043 do not conflict; rather, "under section 1043, subdivision (b)(2), a trial court may continue a trial in a custodial defendant's absence after the trial has commenced in the defendant's presence—without first obtaining the defendant's written or oral waiver of the right to presence—if other evidence indicates the defendant has chosen to be absent voluntarily." (*Gutierrez, supra*, 29 Cal.4th at pp. 1204, 1206.)

Our review of the trial court's factual findings on whether the defendant's absence was voluntary is deferential: "Review is restricted to determining whether the finding is supported by substantial evidence." (*People v. Espinoza, supra*, 1 Cal.5th at p. 74; accord, *Ramirez, supra*, 14 Cal.5th at p. 190.) Further, the Supreme Court in *Ramirez* assumed but did not decide that "the clear and convincing evidence standard of proof applies to the trial court's voluntary absence determination." (*Ramirez*, at p. 190.) In applying that standard, the court explained, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 to 996, "the question on review is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that defendant's absence was voluntary." (*Ramirez*, at p. 190.)

22

3. *Venancio voluntarily absented himself from trial by spreading feces and resisting placement in a waist chain, making his attendance impossible*

Venancio contends the trial court violated his constitutional and statutory rights by conducting the trial in his absence because there was no evidence he refused to attend the trial; he was never violent; and his conduct, although "it could be deemed disruptive," occurred outside the courtroom. We agree with the trial court that Venancio voluntarily absented himself from the trial, thereby waiving his constitutional and statutory rights to attend. (*Gutierrez, supra*, 29 Cal.4th at pp. 1208-1209.)

Although Venancio never expressly refused to attend the trial, there is substantial evidence to support the trial court's finding by clear and convincing evidence that he intentionally made it impossible to be present. On the day before jury selection began, during his examination by Dr. Knapke at the courthouse, Venancio defecated on his hands, smeared feces all over his face, and started eating the feces while claiming the "'demons are bothering me.'" On the first day of jury selection, the trial court found Venancio was competent to stand trial, warned him that spreading feces was unacceptable in the courtroom, and advised him that his appearance while strapped to the safety chair would be highly prejudicial to his case. The court asked Venancio whether he wanted to be placed in a waist chain and commit to refrain from such conduct or to listen from another room, but Venancio did not respond. And when the deputies attempted to place him in a waist chain, Venancio made his body limp so it was "fruitless" to try to place him in a waist chain to appear in court (as defense counsel put it). On the second day of trial, Venancio gripped the arms of the safety chair

23

so deputies could not lift him out of it, and defense counsel argued it would be worse for Venancio to appear in court in the chair than to be excluded because the chair had "a ton of straps" making it look like a "death chamber." And when Venancio was placed in another room to listen to the proceedings, he urinated in the safety chair. On the third day of trial, Venancio was in a waist chain in the holding cell at the courthouse, but he defecated and spread feces all over himself and the holding cell, and there was no way to clean him to safely bring him into the courtroom. On the fourth day of trial, Venancio again defecated and spread feces in his holding cell. On each of these days—as well as on February 8 (day five) and 16 (day 10)—the court made findings Venancio's conduct made it impossible for him to attend the trial, and the court repeatedly advised Venancio of his options, including that he could at any time assert his desire to attend the trial. Venancio never responded.

Under these circumstances, Venancio voluntarily elected not to be present in the courtroom. Venancio could not attend the trial covered in feces (and the deputies could not safely escort him into the courtroom); he could not attend in a waist chain because it was insufficient to stop him from spreading feces; and he could not attend while strapped in the safety chair because it would have been "highly, highly prejudicial." Moreover, the court made a finding (not challenged on appeal) that Venancio was malingering; the court repeatedly and clearly advised of Venancio of his right to be present and provided him options for being present; and the court found Venancio knew his conduct made it impossible for him to attend, yet he persisted in this conduct. (See *Ramirez, supra*, 14 Cal.5th at p. 190 [trial absence is voluntary where defendant is aware of the circumstances, aware

24

of his right to be present, and has "'""no sound reason"'"" for absenting himself].)

Contrary to Venancio's contention, there is no requirement that a defendant refuse to attend trial for the trial court to find he voluntarily absented himself. In *Ramirez, supra*, 14 Cal.5th at pages 181 through 192, for example, the Supreme Court recently affirmed a trial court's ruling that a defendant voluntarily absented himself from trial when he took illicit drugs the night before his second day of trial and was taken to the hospital. The court held there might be circumstances where a medical emergency arising from drug use was not a voluntary absence, but substantial evidence supported the trial court's finding by clear and convincing evidence that it was highly probable the defendant's absence was voluntary in that he calculated his behavior to avoid going to trial (and he was not truly debilitated by the drugs). (*Id.* at pp. 190-192.)

Similarly, in *People v. Rogers* (1957) 150 Cal.App.2d 403, 411 through 412, relied on by the People, the Court of Appeal affirmed a trial court's refusal to grant a continuance to a self-represented defendant who claimed he could not be mentally present on the day he was scheduled to present his defense because he was suffering from diabetic blackouts. The evidence, including a physician's examination and a report from the jail, showed the defendant's condition was self-induced, and on the morning in question, the defendant took a large dose of insulin without eating breakfast and lunch (after eating well and participating in the trial actively on prior days). (*Id.* at p. 413.) The court concluded, "The defendant, by his own actions, induced the condition existing in the afternoon of the fourth day of the trial. This amounted to a waiver of the right to be mentally

25

present granted by [section 1043]. If this were not the rule, many persons, by their own acts, could effectively prevent themselves from ever being tried." (*Id.* at p. 415.)

The People also rely on *People v. Howze* (2001) 85 Cal.App.4th 1380, although the court there considered whether the defendant by his conduct waived his right to be present under section 977, not whether he waived his right to be present under section 1043, subdivision (b).[10]  In *Howze,* the defendant refused to leave his jail cell to attend trial and "did everything he could to sabotage the proceedings, including fighting with deputies, acting as if he was being attacked by imaginary 'bugs' or people, claiming to be possessed by different people, claiming to have various physical maladies that prevented him from coming to court, not cooperating with doctors or mental health experts, not cooperating with his attorneys, stripping naked while in the holding tank to prevent having to go into the courtroom, and rubbing feces on himself to prevent his extraction from his cell when he refused to go to court." (*Howze,* at p. 1398.)  On this basis, the court denied defendant's motion made two days before trial to represent himself. (*Ibid.*)  The court also concluded that the defendant, who had been "advised that a failure to leave his cell to be transported to court for the

---

[10]  In *People v. Howze, supra,* 85 Cal.App.4th at page 1394, the defendant was not present at the commencement of trial, so section 1043, subdivision (b), did not apply.  The case was decided on estoppel grounds because the defendant's refusal to come to court, including his statement, "'I'm not coming back, so do whatever you're gonna do,'" was not "in strict formal compliance" with the statutory requirements for a waiver under section 997. (*Howze,* at p. 1395.)

commencement of trial would be considered a waiver of his right to be present, and subsequently chose not to leave his cell to be transported to court," was "estopped to assert that the trial improperly commenced in his absence." (*Id.* at p. 1396.)

Venancio argues that the cases in which defendants forfeited their right to be present at trial involved situations where they were disruptive inside the courtroom, citing *People v. Bell* (2019) 7 Cal.5th 70, 122 (nine deputies were needed to subdue the defendant after he started banging on the counsel table and tried to lift it). But *Bell* was a capital case, and section 1043, subdivision (b), allowing a trial to proceed in a defendant's absence, did not apply. Here, it is immaterial whether Venancio smeared feces on himself in the courtroom, the adjoining conference room, or the courthouse holding cell. The undisputed evidence is that Venancio could not be cleaned up and safely and hygienically brought into the courtroom on the days he spread feces on himself.[11]

Finally, Venancio argues defense counsel could not waive Venancio's right to be present, citing *People v. Johnson* (2013) 221 Cal.App.4th 943. In that case, the Court of Appeal concluded

---

[11] Venancio also argues that "most cases" in which a defendant has been found to have forfeited the right to be present at trial involved situations where the defendant engaged in or threatened violence, citing *People v. Johnson* (2018) 6 Cal.5th 541, in which a defendant who violently attacked his attorney and cursed at the court in front of the jury was excluded from the rest of his trial under section 1043, subdivision (b)(1), without advance warning. The fact that a court may exclude defendants who are violent in the courtroom without warning does not mean a court may not find a voluntary absence based on nonviolent conduct.

27

the trial court erred (although the error was harmless) in allowing the bailiff to demonstrate the operation of a gun to the jury in the defendant's absence after the defense attorney represented that the defendant was voluntarily absenting himself from the demonstration. (*Id.* at pp. 956-957.) By contrast, defense counsel did not purport to waive Venancio's presence. The attorney simply agreed with the court's finding the safety chair would be very prejudicial and argued the court should exclude Venancio rather than seating him in the safety chair. The court's finding Venancio voluntarily absented himself was based on Venancio's conduct, not a waiver on Venancio's behalf, and the court personally advised Venancio of his right to be in court and the consequences of his conduct on at least four occasions.

Moreover, to the extent Venancio contends the court should have ordered him to appear strapped to the safety chair instead of excluding him (which is not clear from his briefs on appeal), we agree with the People that Venancio waived this argument under the rule of invited error. (See *People v. Waldon* (2023) 14 Cal.5th 288, 304 [""""The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.""""]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [same].) It is clear from the comments made by defense counsel that he believed it was in Venancio's best interest not to be present if the only option was to appear in court strapped into a chair that looked like one used for executions.

B.     *Venancio Has Not Met His Burden To Show Ineffective Assistance of Counsel in Failing To Object to the Victims' Prior Statements to SART Nurses*

Venancio contends his trial attorney provided ineffective assistance of counsel when he failed to object to statements Evelyn and Gabriela made to the SART nurses describing threats Venancio made during the rape and assault. Venancio argues Evelyn's statement to Courtemanche that Venancio told her "I'm a professional," and Gabriela's statement to Swintelski that Venancio said "This isn't my first rodeo," were inadmissible hearsay and unduly prejudicial because they implied Venancio had previously raped other women. Venancio has not met his burden to show ineffective assistance of counsel because defense counsel had a rational tactical purpose for allowing the jury to hear the victims' prior statements: to show inconsistencies between their accounts to the nurses and their trial testimony.

To prevail on a claim of ineffective assistance of counsel, a defendant bears the burden to show (1) the "'"counsel's representation fell below an objective standard of reasonableness under prevailing professional norms"'" and (2) the defendant "'"suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome."'" (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 806; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

A court reviewing a claim of ineffective assistance of counsel "begin[s] with the presumption that counsel's actions fall within the broad range of reasonableness, and afford[s] 'great deference to counsel's tactical decisions.'" (*People v. Mickel* (2016) 2 Cal.5th 181, 198; accord, *People v. Lewis* (2001) 25 Cal.4th 610,

661 ["Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel."].)  Moreover, the defendant's burden is "'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission."  (*Mickel*, at p. 198; accord, *People v. Woodruff* (2018) 5 Cal.5th 697, 746; see *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 ["'On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."""].)

In this case, there is no need to parse the record to find defense counsel's objective in not objecting to the victims' prior statements.  Outside of the presence of the jury—after the prosecutor adduced Evelyn's statement but before Gabriela's statement—the trial court asked defense counsel whether the court was correct in assuming he did not object to the statements made to the nurse at the rape treatment center "for a strategic reason so that you could get it all in to show whether there were inconsistencies in the actual narration to these medical personnel."  Defense counsel answered yes.

Venancio has not shown this was not a rational objective. (See *People v. Lewis, supra*, 25 Cal.4th at p. 661 [rejecting claim of ineffective assistance of counsel based on failure to object to police officer's testimony about defendant's postarrest statements, explaining "nothing in the record suggests defense counsel lacked a rational tactical reason for not objecting to

Officer Smith's testimony. [Citations.] For example, counsel could reasonably have viewed the officer's testimony as further support for the defense position that defendant did not actually use a weapon during the robbery."].) It appears from the record that defense counsel believed the victim's inconsistent statements to the nurse supported the defense position that both victims were escorts who fabricated details of the rape or assault to show a lack of consent or to conceal their own unlawful conduct. Indeed, Venancio's attorney in his closing argument focused on discrepancies between Evelyn and Gabriela's statements to the SART nurses and their testimony at trial. For example, defense counsel highlighted that Evelyn told Courtemanche that Venancio forced her to ingest methamphetamine, but she testified at trial that she did not take the drugs he offered. He likewise pointed out that Gabriela told Swintelski that Venancio had repeated sexual contact with her, but at trial she said the assault ended before any sexual contact. Gabriela also told Swintelski Venancio wielded a hammer, whereas at trial she said he had a knife. The attorney argued, "you can consider all her . . . inconsistent statements that she made that are different from the date of the incident from her testimony at trial. You can consider all that stuff in evaluating whether or not there's a reasonable doubt as to whether Mr. Venancio either robbed or raped her."

Venancio argues his attorney had no legitimate reason not to object to Evelyn and Gabriela's specific statements that Venancio told them, respectively, he was a "professional" and it was not his "first rodeo" because their trial testimony was silent (rather than inconsistent) on this point, and so the admission of the prior statements would not damage their credibility. But

31

that is an artificially narrow view of defense counsel's strategic objective. He may have felt the "first rodeo" and "professional" threats were histrionic and would be perceived by the jury to have been fabricated. Or he may have reasoned that a hearsay objection to those statements could have led to exclusion of the victims' other prior statements that were critical to the defense strategy. We "begin[] with the presumption that counsel's actions fall within the broad range of reasonableness," and we find no "affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission." (*People v. Mickel, supra,* 2 Cal.5th at p. 198.)

Venancio also argues that defense counsel was aware that Evelyn's and Gabriela's statements were inadmissible because at the Evidence Code section 402 hearing, the trial court expressed a concern that similar proposed testimony by Hedden that Evelyn told her Venancio said "he had done this several times before" could be inadmissible hearsay and would be highly prejudicial. But the fact defense counsel, the trial court, and the prosecutor were all attuned to the hearsay and prejudice arguments surrounding the prior statements does not support a showing that defense counsel had no rational tactical purpose for not objecting. To the contrary, it is clear from the trial proceedings, including the trial court's direct inquiry whether the attorney had a "strategic reason" for not bringing a hearsay objection, that this was not a case of inadvertence or incompetence, but a reasoned strategy.

## DISPOSITION

The judgment is affirmed.


                                    FEUER, J.

We concur:


PERLUSS, P. J.


ESCALANTE, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.